## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TRACY MELISSA CURRY,

   Plaintiff,

vs.             No. CIV 12-1074 WJ/LFG

CAROLYN W. COLVIN, Acting,
Commissioner of Social Security,

   Defendant.

### MAGISTRATE JUDGE'S ANALYSIS
### AND RECOMMENDED DISPOSITION[1]

  **THIS MATTER** is before the Court on Plaintiff Tracy Melissa Curry's ("Curry") Motion

to Reverse and/or Remand the Administrative Agency Decision, filed April 15, 2013. [Doc. 18.]

The Acting Commissioner of Social Security issued a final decision denying benefits, finding that

Curry was not entitled to disability insurance benefits ("DIB").  Defendant filed a response to

Curry's motion [Doc. 19], and Curry filed a reply [Doc. 20].  Having considered the pleadings

submitted by the parties, the administrative record ("AR"), and the applicable law, the Court

---

[1]**Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions). On October 1, 2013, the Court entered a Temporary Administrative Order Relating to All Civil Cases involving the United States.  13-mc-04 (Oct. 1, 2013).  The Order stays most cases involving the United States, including cases such as this one.  Therefore, while the Court enters these findings and recommendations, the parties have up until 15 days after the stay is lifted to file objections.**

recommends that Curry's motion to reverse or remand be denied, and the case be dismissed, with prejudice.

## I.    **PROCEDURAL BACKGROUND**

In early October 2009, Curry applied for DIB with an onset date of November 6, 2006. [AR 137.] The onset date corresponds to a stroke Curry suffered in November 2006, from which she was not severely impacted. [AR 36.] She had another stroke in early 2009, that had more debilitating effects. [*See, e.g.,* AR 36, 42, 315-320, 565.] Curry alleged she was disabled due to a stroke ("CVA"), memory problems, right-sided paralysis (intended to be left-sided paralysis), and high blood pressure. [AR 83.] Her DIB application was denied at the initial and reconsideration levels. [AR 80, 82.] On June 9, 2011, the ALJ held an administrative hearing, at which Curry and counsel were present. [AR 28-78.] The ALJ noted at the beginning of the hearing that Curry's date of last insurance ("DLI") was March 31, 2008. [AR 30.] Thus, the question was whether Curry was disabled between the onset date of November 6, 2006 and the DLI of March 31, 2008.

On February 22, 2012, the ALJ issued a decision denying Curry's application for DIB. [AR 14-21.] He determined, *inter alia*, that Curry was not under a disability from November 6, 2006 through the date she was last insured. [AR 14.]

On August 30, 2012, the Appeals Council denied Curry's request for review. In so doing, it considered counsel's April 2012 brief and Dr. Roblero's letter, dated July 6, 2012. [AR 6.] The Council discussed Dr. Roblero's letter, along with the physician's previous letter in June 2011, but found that the doctor's opinions did not relate to the period at issue from November 2006 to March 31, 2008, the DLI. [AR 4.]

On September 21, 2012, an Administrative Appeals Judge wrote to Curry initially noting that the Council had received more evidence that could justify reopening the matter, but that he found

no reason to reopen or change the decision.  The letter further advised Curry that medical evidence from 2012 referred to her impairments following a second stroke in 2009.  [AR 1.] "All limitations caused by or resulting from your stroke of January 2009 cannot be considered for determining whether you are disabled [with respect to an onset date of November 2006] because you no longer meet the insured status requirements." [Id.]  On April 2, 2012, Curry filed a Complaint seeking review of the ALJ's decision. [Doc. 3.]

Curry was born on June 15, 1965 [AR 137] and was 46 years old at the time of the ALJ hearing.  She obtained a high school education and attended two years of college without attaining a degree.[2] [AR 18, 34, 166.]  She is single and lives in an apartment in Albuquerque, New Mexico with a number of pets.  [AR 34.]  Curry last worked in 2003 as an inventory specialist. [AR 34, 35.] She quit that job after her father passed away and left her an inheritance. [AR 35.] Curry did some photography work on the side for pay. [AR 35-36.] Earlier, in the late 1990s, she worked as a city bus driver in New York City.  However, she suffered an emotional breakdown in 1997 while driving and was demoted to a bus cleaner. [AR 18.]

Curry's annual earnings were minimal through the late 1980s and early 1990s.  Her earnings in the mid-1990s are: $14,229 in 1994; $30,038 in 1995; $12,126 in 1996; $30,810 in 1997; $11,077 in 1998; $30,476 in 1999; $14,935 in 2000; $5257 in 2001; $13,184 in 2002; and $1035 in 2003. [AR 147.] After receiving an inheritance in 2003 and quitting work, Curry had no significant gainful activity ("SGA").

In examining the AR and the parties' positions, it is significant that there is almost no objective medical evidence from the period after Curry's first stroke in November 2006 through the

---

[2]Another record indicates Curry achieved a college degree [AR 233], but most records note she attended two years of college.

March 31, 2008 DLI, and up until she suffered the second stroke in January 2009.  Counsel explained that Curry did not obtain much treatment after the first stroke because she had no insurance coverage. [AR 31, 33.] Curry testified that she received a monthly "death benefit" from her father's pension for bills and rent, but that she did not ask her family to cover any medical treatment subsequent to her first stroke. [AR 49-51.]  After the 2009 stroke, there is significant medical evidence concerning Curry's impairments and treatment.  Indeed, in the ALJ's written decision, he found that following the 2009 CVA, Curry's impairment would meet the listing at § 11.04(B), central nervous system vascular accident. [AR 19.]

## II.      STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

4

1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, she is capable of performing other work.[10]

The ALJ decided this case at step four by determining that Curry could perform past relevant work ("PRW") as a bus cleaner, cleaner business, and inventory clerk from the onset date through the DLI. [AR 20.]

### III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).

---

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record."  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted).

The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1214.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

IV.   **ALJ'S FINDINGS**

In denying Curry's DIB application, the ALJ found that Curry last met the insured status requirements on March 31, 2008, and that she did not engage in SGA during any period from the alleged onset date of November 6, 2006 through the DLI. [AR 16.]

The ALJ determined that Curry had severe impairments of "status post cerebral vascular accident and hypertension" during the pertinent period until the DLI.  The ALJ noted that he reviewed medical evidence from the Long Island Jewish Medical Center from 1996 but did not find evidence of medically determinable impairments during the period of concern. [Id.] The ALJ also examined the medical notes from the New York Metropolitan Transit Authority ("MTA"), dated 1998 to 2000, that indicated various psychiatric diagnoses, including "possible schizophrenia."  The ALJ concluded that the medical records from 1998 to 2000 concerning these possible conditions did not provide a conclusive diagnosis. [AR 17.] Based on the medical records, the ALJ questioned if Curry was ever definitively diagnosed with schizophrenia.  Even if accepting schizophrenia as a questionable diagnosis, the ALJ found no evidence during the pertinent time period to indicate that condition was a medically determinable impairment. [Id.]

The ALJ further decided that through the DLI, Curry did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  In so concluding, the ALJ carefully considered listing §§ 11.04 and 4.00 and all other listings. [Id.]

After reviewing the entire record, the ALJ found that Curry had the residual functional capacity ("RFC") to perform the full range of medium work during the pertinent time frame.  This meant she could lift no more than 50 pounds at time, frequently lift or carry objects weighing up to 25 pounds, and sit, stand or walk for at least six of eight hours a day. [Id.] Based on a thorough review of the medical evidence and testimony by the vocational expert, the ALJ decided that Curry's

RFC did not preclude her from performing PRW.  [AR 19-20.] The ALJ concluded that Curry was

not under a disability between the November 2006 onset date and the March 2008 DLI. [AR 21.]

## V.   MEDICAL HISTORY AND BACKGROUND

### *1990-2000 Medical Records and History*

Curry testified that she drove a transit bus for the New York City MTA from about 1994 to

1997, when she had an emotional breakdown while driving. [AR 61.] In August 1997, she was

admitted to a hospital for auditory hallucinations.  She was prescribed Risperdal.[11]  The diagnosis

included "rule out schizophrenia."  The doctor, in 1997, opined that Curry probably needed lifelong

therapeutic services. [AR 733.]

In March 1998, Curry was noted as being on restricted work status with the MTA.  She

reported earlier episodes of what the doctor described as "bizarre psychotic thought and behavior."

She had been out of work since August 10, 2007 because of "black magic." [AR 746.] She was

never free of auditory hallucinations.  However, the physician observed that Curry did not appear

unusual, she was appropriately and neatly dressed, and she was not depressed or agitated.  The

medication did not interfere with her attention.  Curry had a wide circle of friends.  She had been

treated for paranoid schizophrenia.  The psychiatrist opined that Curry could perform her work

duties if limited to work within the transportation depot. [AR 747.] On December 1, 1998, Dr. Hu

wrote a letter noting Curry had been under his care for six months and was stable.  He recommended

she resume light duty work.  [AR 722.]

---

[11]"Risperidone . . . (trade name Risperdal, and generics) is an atypical antipsychotic drug which is mainly used to treat schizophrenia (including adolescent schizophrenia), schizoaffective disorder, the mixed and manic states associated with bipolar disorder, and irritability in people with autism." http://en.wikipedia.org/wiki/Risperidone (10/7/13)

An MTA record of a mental status assessment in April 2000 indicates Curry was demoted to a cleaner in 1998, had been working in that position since then without difficulties, and that she could continue.  She was mildly worried and anxious; she agreed to receive therapy.  [AR 712-714.] Curry testified she remained working for the MTA through about 2000. [AR 62.]  While still working for the MTA, Curry took a 90-day leave of absence to care for her mother, and ended up leaving the job and obtaining unemployment benefits.  [AR 64.]  In 2001 or 2002, Curry moved to North Carolina and worked there with Rent-A-Center and Washington Inventory.  [AR 62,64.]

There are no additional medical records until Curry suffered a stroke in November 2006, although based on testimony, Curry apparently relocated to New Mexico in approximately 2005.

### *2006 Medical Records*

On November 21, 2006, Curry was admitted to a hospital having suffered a CVA in the right basil ganglia and right caudate nucleus.  Curry was initially unresponsive.  She answered questions with one word and was unable to stay awake. [AR 200.]  Her hypertension ("HTN") and high cholesterol were uncontrolled. [AR 198.]  She had a family history of CVA. [AR 198.] Curry remained hospitalized for about five to six days.  She received some physical, occupational, and speech therapy and was to follow up with her primary care nurse practitioner after discharge.  Case managers were working to enroll Curry at UNM for outpatient physical and occupational therapy. She had no insurance and did not qualify or have benefits for rehabilitation services or outpatient therapy.  The hospital medical notes indicate Curry improved after admission and was ambulating well. [AR 198.] On discharge, she still had some loss of function of her upper left extremity with some left facial droop.  She was stable.

During her November 2006 admission, Curry's testing showed some irregularities but not significant vascular abnormalities. [AR 203.] She had mild to moderate left ventricular hypertrophy.

[AR 202.] The head CT showed subtle loss of gray-white matter differentiation in the area of the motor cortex on her right side. [AR 205.]

### *2007 Medical Records and Related Testimony*

On February 27, 2007, Curry was seen by a Physician's Assistant at Lovelace. This record indicates Curry was a new patient, needed blood work and medication, and was a self-pay patient. [AR 570.] She had been seen for a stroke in November 2006. Curry had a known history of HTN and hyperlipidemia before going to Lovelace's Emergency Room ("ER") in November. After discharge, this record indicates that Curry was prescribed three different blood pressure medications, cholesterol medications, and aspirin. But, Curry wondered if she could eliminate a medication as they were expensive and she was a self-pay patient.

After discharge from the hospital, Curry reported she had no headaches, blurred vision, chest pain, or other problems. There was still some decreased grip strength on her left hand, but it was improving. Curry never obtained physical or occupational therapy through UNM because she made too much money. Curry requested a screen for STDs as she was sexually active and did not use any protection. The record indicates Curry worked as a photographer and had two years of college. She smoked a pack of cigarettes a day. Her exercise consisted of walking a dog. Her HTN was in good control, but the provider was concerned that Curry's dry cough stemmed from one of the medications. Curry was to keep a log of her blood pressure readings and follow up in a month or sooner. She was encouraged to take her medications for hyperlipidemia. [AR 570-72.] The provider discussed with Curry why she needed to continue taking the medications and also why she should attempt to lose weight and stop smoking. The provider also talked to Curry about several ways to obtain individual insurance that might be helpful.

There are no more medical records until 2008 and 2009.

During the administrative law hearing, Curry testified in relation to this time frame that she obtained no medical care at all after the first stroke in 2006 and that she went to Lovelace mainly for female problems. [AR 37.] Curry, who is right-hand dominant, stated that after the first stroke she was working on strengthening her left arm.  [AR 38.] In retrospect, she assumed that she continued to have high blood pressure after the first stroke, but she did not know that. [AR 38-39.] Curry did not obtain any type of rehabilitation after the first stroke. [AR 39.] While she stated she did not have insurance, she did not try to go to any indigent clinics or get free care. [AR 40.]

Curry testified further that initially after the first stroke, she could move her left arm some but could not hold anything heavy with her left hand. [AR 41.] She was not aware of having any other problems as a result of the first stroke, including difficulties with walking, sitting, sitting up, standing, or talking. [AR 41-43.] Her right arm and hand were not affected by the first stroke and were "100 percent." [AR 43.] Curry stated it took her about six months to a year to get back some use in her left arm.  After six months to a year after the first stroke, Curry testified she would use her left arm "just like if it was normal but I couldn't like I said, . . . hold nothing heavy or nothing hot and heavy . . . ." [Id.] At the ALJ hearing, Curry recalled that her left arm in 2006 was "very, very weak." [AR 44.] She could lift comfortably "maybe [a] five pound bag of sugar."

Curry stated that she apparently also had "left side neglect" after the first stroke although she did not understand that concept until after the second stroke. [AR 44-45.] She remembered bumping into objects because she could not judge the distance correctly. [Id.]

When asked about her daily activities after the first stroke, Curry testified that she "was doing everything (meaning household chores) because the arm was weak but it was working.  I could do anything." [AR 47-48.] Between the two strokes, Curry drove herself, four cats, and two dogs through Mexico and Guatemala to Honduras. [AR 48, 70.] She had no problems driving or

taking that trip, although at the hearing she stated she should not have done the trip and that she had endangered herself. [AR 48.] She took photos during that trip requiring the use of both hands. [AR 70.]

Curry did not take any of the prescription medications during the pertinent time frame because of lack of finances. [AR 49.] But, when asked who paid for the trip to Honduras and her expenses, she stated that her family trust paid. [Id.] Curry did not directly answer the ALJ's question as to how much money she received from the trust on a monthly basis, but another medical record indicated an amount of about $2000. [AR 485.] Prior to her second stroke, Curry never asked her family to cover medical expenses or treatment. [AR 50-51.] Curry testified that she obtained her monthly income to go shopping for groceries. [AR 57.] She also had pets that she afforded. [Id.]

### *2008 Medical Records*

March 31, 2008 is the date Curry was last insured. [AR 14.]

On June 11, 2008, Curry was seen at Albuquerque Health Partners. The medical record is short and notes Curry was not taking any medications as of this date. [AR 569.]

### *2009 Medical and Disability Records*

In January 2009, Curry suffered a debilitating stroke. Neighbors had not seen Curry walking her dogs for several days and called the police. Police discovered her lying inside her apartment. She was in serious condition having had a "large stroke." [AR 323-453, 651.] Curry also suffered from blood loss, mental status changes and paralysis on the left side. She had uterine fibroids, a urinary tract infection, anemia, and hypertension. She was in acute renal failure. [AR 315-320.] Curry underwent several different procedures while hospitalized, including a uterine artery embolization and debridement. She received an IVC filter. Curry was prescribed numerous medications and underwent extensive testing. She was hospitalized for over a month. [AR 314.]

The hospital made inquiries about Curry in an attempt to obtain her history. They were told by an apartment supervisor that Curry had above average intelligence, traveled a lot and did photography. [AR 470.] A cousin stated Curry had no known medical history, no medications, and no primary care physician. [AR 364.] Curry was not working but received her father's "retirement money." Her hobbies were photography and international travel. [AR 364.] This note indicates Curry's father died at age 57 from an aneurysm, and that her mother died at age 52 of complications from diabetes. Her brother died in his 40s of myocardial infarction. [AR 364.]

The Court does not summarize in detail the 2009 medical records that relate to the second stroke as they are not pertinent to the key question in this case. Eventually, after discharge, Curry was sent to a rehabilitation ("rehab") center in Roswell, New Mexico. [AR 227.] She was admitted to the rehabilitation center for comprehensive inpatient treatment, including occupational and physical therapy. This record indicates the CVA in 2006 was resolved, but that Curry's HTN was poorly controlled. Curry had a history of menorrhagia and nicotine addiction. [AR 231-32.]

A March 6, 2009 rehab record reflects that Curry worked as a photographer and planned to return to that job. While she previously was independent in the community, this provider noted Curry had a CVA in the shower in January, and lay on the floor for three days before being discovered. Curry was described as very tall, 5 foot 11 inches. [AR 304.] She lived in an apartment with two dogs and four cats. [AR 305.] She had arranged to have a private-pay CNA assist her for up to three hours a day when she was discharged from rehab. [AR 305.]

During her stay at rehab, Curry received extensive therapy. She continued to demonstrate grossly impaired insight and judgment, along with cognitive issues. She needed help with daily activities in order to return home. [AR 252-53.] One record indicates that Curry's mother and

13

grandmother had strokes, HTN, and diabetes. [AR 233.] This record also noted that Curry's CVA

in 2006 was resolved. [AR 234.]

Upon discharge from rehab, Curry was prescribed numerous medications for various

conditions. [AR 230.] She made steady progress in various areas by April 2009, but still exhibited

moderately impaired levels of cognitive functioning. [AR 279.]

A record from Albuquerque Health Partners ("AHP"), dated May 6, 2009, notes that these

providers had not seen Curry in two years.  At that time, Curry was noncompliant with respect to

her follow-up from the CVA that occurred in November 2006.  Curry told the provider at AHP that

she wanted to go to Florida that weekend to visit her uncle.  The provider was unclear what

medications Curry actually was taking.  She did not exercise and continued to smoke. [AR 565-66.]

The provider wanted to get a home health nurse to Curry's home to start working with medication

compliance and therapies. [AR 567.] It was against medical advise for Curry to travel to Florida or

drive.  However, it is not clear if Curry went to Florida or not.  The record states that the provider

discussed with Curry the need to see someone regularly.  In addition, this physician suspected that

Curry's "poor compliance has resulted in a repeat CVA." [AR 568.]

On May 20, 2009, Curry again saw a provider at AHP.  Curry had not obtained the labwork

as requested.  She stated she had no insurance and could not pay.  She was seeing a physician at First

Choice, but the AHP provider believed Curry needed more extensive medical follow-up. [AR 564.]

On May 25, 2009, Curry presented at University Hospital ER for chest pain, while watching

TV and smoking. [AR 454.] Curry was minimally active, spending most of the day watching TV

or movies.  She was out of some prescribed medications and taking others only intermittently.  She

lived alone and supported herself through pension money of her father's.  She had smoked for 25

years.  She had no use of her left arm and had left facial droop. [AR 456.]

14

On May 26, 2009, the AHP provider received Curry's medical records and understood the extent of Curry's complications. The provider recommended that Curry receive medical care at UNM due to the extent of her problems. She had a very complicated medication situation that required care by multiple specialists. [AR 563.]

It appears that on the same day, May 26, Curry was seen at UNM for help obtaining her medications. She had no insurance and said she was paying $400 a month at Walmart for medications. She had an income of approximately $2,000 per month from her father's pension. [AR 485.] She had a stroke in January but it was not determined yet if she was eligible for social security income or Medicaid due to excess income. She presented to the ER with chest pain. Curry was informed how to get medications through UNM and seemed happy to receive information about financial assistance. [Id.]

On about June 16, 2009, Curry went to UNM ER. They performed a lumbar puncture to rule out a subarachnoid hemorrhage. Not all of the records are legible, nor do they appear relevant to the time frame. [AR 487, 492.]

On September 19, 2009, Curry presented to UNM ER. She complained of blurry vision in her right eye. Her history was documented as having a CVA in 2009. She went to a doctor's appointment that afternoon, and her blood pressure was high. When she drove home, she noticed blurry vision and a foreign body sensation over her right eye. The provider described Curry has having a TIA on November 2006. She was still smoking. The CT scan was negative. [AR 501-03.] There are related records. [AR 506-521, 522-536.]

On October 23, 2009, Curry filed her DIB application. [AR 137.] During an interview with disability services, she was observed as having problems understanding, talking, and answering. She gave the interviewer the wrong information and mixed up dates. [AR 148-49.]

On November 19, 2009, the Function Report notes that Curry watched TV, lived alone in an apartment, and fed her pets.  Her neighbors helped.  She could drive and walk before her second CVA but had trouble putting on jackets, coats, and socks.  She fed herself with her right hand.  She took her medications and received "Meals on Wheels."  She could not use two hands but could do the laundry although it took longer.  Her left side was paralyzed.  She could not judge distances.  Curry attended Bible study two times a month.  The second stroke affected her memory, movement and sight. [AR 151-56.]

There is an Adult Disability Report indicating Curry was 5'11" and weighed 208 pounds. [AR 160.] Curry stated in the report that she stopped working on November 6, 2006 due to disability, but other records indicate she stopped working in 2003 after receiving a pension. [AR 161.]

### *2010 Medical and Disability Records*

On January 9, 2010, Dr. Paul Cherry filled out a Psychiatric Review Technique form but noted insufficient evidence to complete the form. [AR 538.] Curry had a confirmed diagnosis of a CVA and allegations of memory problems. [AR 550.] But there was insufficient evidence available to rate the severity of her impairments. [Id.]

On January 16, 2010, Curry had a physical RFC assessment.  She could lift up to 50 pounds occasionally and 25 pounds frequently.  She could stand or walk 6 hours. [AR 553.] There were allegations of a stroke, memory problems, "right side" paralysis (should be left side), and high blood pressure.  Records indicated that she had a "mild CVA" in November 2006 and was ambulatory on discharge.  She did not have any rehabilitation after the mild CVA.  The discharge notes from her second stroke in March 2009 indicated a complete recovery of function from the November 2006 episode.  However, on January 23, 2009, Curry had a more extensive CVA and had not fully

16

recovered full functioning.  The RFC included the period of onset date to January 23, 2009 when she had another CVA.  After the 2nd CVA, Curry's impairment met a listing. [AR 554.] The physician noted there were no medical records from November 27, 2006 to January 23, 2009.

In January 2010, Curry's initial application for DIB was denied. [AR 80, 83.] The Agency concluded Curry was not disabled through the DLI.  On March 3, 2010, Curry filed a request for reconsideration.  She alleged disability due to physical and mental impairments and stated she was unable to perform a full range of light or sedentary work. [AR 92.]

On March 17, 2010, Curry was seen at First Choice.  She had severe HTN and major problems.  This provider noted he had seen her for the first and only time on February 17, 2010, and had asked that she increase certain medications due to high blood pressure. [AR 579.] Curry was 40 minutes late for the appointment and did not bring her medications as requested.  Because Curry had transportation problems, the provider saw her on this date.  She did not have cardiac symptoms. Curry continued to smoke but stated she had no money for one of her medications.  The provider found Curry's recitation of her medications to be unclear.  She had HTN with probable hypertensive heart disease and retinopathy.  Her condition was better but not under ideal control.  This might be due to her failure to take medications as prescribed.  The doctor told Curry she could not provide good care for Curry and her HTN because Curry did not take her medications.  The doctor informed Curry that she could not be responsible for her if she did not follow the instructions about medications. [AR 579-580.]

There is a record, dated April 5, 2010, indicating Curry had UNM Care coverage. [AR 612.]

On June 14, 2010, Curry was seen at First Choice to re-establish as a patient.  She said her heart was beating fast.  Her HTN was under fair control. [AR 578.]

On July 7, 2010, Curry's request for reconsideration was denied. [AR 80, 93.] On July 20, 2010, she requested a hearing. [AR 96.]

Curry filled out a disability report for her appeal. Her blood pressure was out of control with her medications. Her speech and memory were worse. Her left foot felt frozen, and her left arm was paralyzed. Curry was constantly fatigued. She was depressed and withdrawn. It was difficult to get out of bed. These changes occurred in October 2010. She needed help dressing and with household chores. [AR 177.]

On August 3, 2010, Curry had a physical therapy appointment at UNMH. [AR 610.]

On August 11, 2010, there are notes indicating Curry lived alone in her apartment, paid $765 in monthly rent, and $130 for electricity. She was unemployed and had not worked since 2003. Curry had a car but should not drive. She was supposed to attend a cardiac group and a stroke lab but did not. The social worker had talked to her before about getting her medications. [AR 608.]

On August 16, 2010, Curry was seen at First Choice. Her HTN was good. She was to restart her medications. She was referred to a smoking cessation group as she was ready to quit. [AR 577.]

In October 2010, Curry was seen by an OB/GYN at University Hospital. She had smoked one-half pack of cigarettes since she was 18. Due to heavy menstrual periods, they needed to perform an endometrial biopsy. [AR 601.]

On November 2, 2010, Curry was seen for occupational therapy at UNMH. She managed her HTN and abdominal pain with medications. She was ambulating without a cane. She was independent with dressing but it was difficult. Her car was totaled. She was previously employed as a photographer, and her hobbies were paining ceramics and watching TV. Curry needed to use a "quad" cane but did not always do so. [AR 600.]

18

On November 5, 2010, Curry returned to First Choice and stated she enjoyed smoking too much to stop. [AR 576.] Curry started to receive therapy from First Nations in November. [AR 578, 585, 704.] She continued to see an OB/GYN for menstrual and bleeding problems. [AR 592, 597.]

Curry also continued with occupational and physical therapy on an outpatient basis. [AR 595, 596.]

### *2011 Medical and Disability Records*

The Court does not summarize many of these records as they do not pertain to the pertinent time frame.  Curry continued to receive various therapies, including counseling, physical therapy, and occupational therapy. [AR 583, 589, 590, 591, 619, 622, 629, 630, 634, 637, 642, 643, 644, 645, 647, 648.] She was also seen at First Choice on several occasions in 2011. [AR 574, 630, 632, 634, 637.]

In an undated Disability Report, Curry noted various problems, but they all related to her 2009 stroke. [AR 183.] She did not appear to be following through with physical therapy appointments, and the therapist noted he might discharge Curry if she did not schedule an appointment.  [AR 590.]

On March 3, 2011, Curry was seen in the neurology department at UNMH.  She had two strokes.  The provider noted Curry had stopped taking her medications, including her blood pressure prescription and aspirin.  She continued smoking and had another stroke in 2009.  The 2006 stroke was described as smaller.  She could walk at this time but was not working.  She drove occasionally.  Currently, she was taking her medications, but she was still smoking.  This record states that the physical findings were secondary to "his" strokes in 2006 and 2009. [AR 624.] But, this is the only record attributing physical symptoms in 2009-2011 to the 2006 stroke.  On March 14, 2011, Curry

was discharged from physical therapy. She had been seen for 8 visits but had not returned. [AR 622.]

On April 5, 2011, an occupational therapy record notes that Curry suffered from shoulder pain and wore hand splints. She lived alone and had two dogs. This therapist stated that Curry had a CVA in 2006 "with no residual deficits from that stroke." Even with the more debilitating stroke in 2009, this record states that Curry was very functional, had high energy, and was positive and sociable. Curry had no use of her left hand. She was referred to this clinic on February 17, 2011 with shoulder pain but did not return after that date and her status was unknown. She was being discharged. [AR 619.]

On April 11, 2011, there is a note from Dr. Roblero, with First Nations, to Curry's apartment building management company. Dr. Roblero had seen Curry since January 2011 and was familiar with Curry's limitations. The letter stated an individual could have up to six animals in New Mexico, four of which could be dogs. In order to alleviate Curry's limitations and enhance her independent living and enjoyment, Dr. Roblero prescribed three cats and two dogs as emotional support animals to assist Curry in coping with her disability. [AR 647.]

On June 9, 2011, the ALJ held an administrative law hearing, at which Curry, her attorney and a VE were present. [AR 28-29.] *See discussion supra* under 2007 Records for a description of Curry's testimony.

At the end of the administrative hearing, Curry's attorney asked that a neuropsych evaluation be completed. [AR 77.] The ALJ left the hearing open for two weeks but stated it was doubtful that an evaluator could differentiate between Curry's current condition and her condition before the March 2008 DLI. [AR 78.]

On June 10, 2011, Dr. Steven Baum performed a mental health evaluation. [AR 756.] He noted that the focus of the evaluation was Curry's request for benefits in relation to the 2006 CVA. Curry lived alone and had traveled by bus to the interview.  She was the only child of deceased parents.  Curry relocated to Albuquerque about five years earlier.  On this date, her left arm was in a sling.  She stated she had no personal psychiatric history until the last four years when she had the strokes.  She described the first stroke as involving a brief hospital admission and that she was released shortly thereafter without follow up.  The second stroke in 2009 was more extensive.

Curry had a high school education (but actually attended two years of college according to other records) and had not worked since she moved to New Mexico.  She took care of pets, watched movies and could shop and do household chores. [AR 756.] Dr. Baum observed no behavioral abnormalities during the mental status exam, and no psychotic features were reported.  While there was a history of psychiatric problems, Dr. Baum noted that Curry did not report current symptoms like auditory hallucinations.

Curry's IQ was average, and her social judgment was in tact.  She had a mild neurocognitive disorder, but Dr. Baum observed no evidence of a prior diagnosis of PTSD.  The diagnosis of schizophrenia by history indicated it should be ruled out.  Curry's prognosis was guarded due to her denial of symptoms and "under reporting" of past schizoid problems.  Dr. Baum stated he could suggest that the diagnosis of schizophrenia was permanent and could suggest she was minimizing symptoms.  However, she could also have found a relatively stress-free lifestyle that did not trigger those symptoms.  With sufficient stress, Dr. Baum surmised that Curry would hear voices and that she would not be able to function on a daily basis. [AR 757.] But, at this time, there was no psychosis and there were no serious symptoms to "rule in" a serious mental disorder.  Her GAF of 45 stemmed from limited daily activities. [AR 757.]

### *2012 Medical and Disability Records*

On February 22, 2012, the ALJ issued a decision denying DIB benefits for the time period at issue. Curry had severe impairments of status-post CVA and hypertension. The ALJ reviewed the early records from 1996-2000 and considered a possible diagnosis of schizophrenia from that period. [AR 17.] However, even if he accepted the questionable diagnosis of schizophrenia from the 1990s, there was no evidence of this condition from the onset date to the DLI. [AR 17.] The ALJ reviewed Dr. Baum's June 2011 report, but Dr. Baum offered no opinion as to Curry's mental condition through the DLI and before the disabling second stroke. The ALJ carefully considered possible listings but found none from the onset date to the DLI. He concluded Curry could perform a full range of medium work, including lifting 50 pounds occasionally, 25 pounds frequently, and sitting, standing, or walking up to six hours. [AR 17.] The ALJ thoroughly reviewed the medical records and testimony. He could not find evidence to support an earlier onset date. [AR 19-20.] In finding Curry not entirely credible, the ALJ noted her activities, vacation and travels, photography, use her left hand, physical abilities, and lack of treatment. Curry stated she could not afford treatment during the pertinent time frame but also testified she received money from a family trust that she used for treatment after the second stroke. The ALJ concluded Curry could perform her PRW of bus cleaner, cleaner business and inventory clerk. [AR 11-20.]

On July 6, 2012, Dr. Roblero wrote a letter to DVR, indicating Curry had a cognitive impairment that prevented employment. [AR 768.] There is a letter from Curry's attorney to SSA, stating counsel was withdrawing at the request of Curry. [AR 8.] Curry has a different attorney representing her in terms of the briefing of the motion for remand.

On August 30, 2012, the Appeals Council denied the request for review. [AR 3.] On September 21, 2012, after receiving additional evidence, the Appeals Council declined to reopen the matter. [AR 1.]

## VI.   DISCUSSION

### A.   Alleged Legal Errors

Curry argues that she became disabled "many years ago from schizophrenia, and more recently, from a stroke." [Doc. 18, at 1.] In her brief supporting the motion for remand, Curry emphasizes the medical records from the late 1990s, along with medical evidence pertaining to the 2009 stroke. [Id., at 3-8.]

With respect to the issues for review, Curry contends that the ALJ erred in three ways with respect to the PRW finding: (1) the RFC is unsupported by the evidence; (2) the ALJ failed to develop the record regarding limitations from Curry's mental impairment that should have been included in the RFC; and (3) the ALJ failed to complete the step four analysis. [Id., at 10.]

### B.   Analysis

#### 1.   RFC Assessment

At step four, the ALJ is required to evaluate the claimant's physical and mental RFC, the physical and mental demands of the claimant's past relevant work, and decide if the claimant has the ability to perform those job demands.  Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996).

Here, the ALJ specifically found that during the pertinent time frame, from the November 2006 onset to the March 2008 DLI, Curry could lift no more than 50 pounds at time, could frequently lift or carry objects weighing up to 25 pounds, could stand, walk, or sit for at least six hours a day. [AR 17.] In support of that RFC, the ALJ noted he considered all of the symptoms that

could reasonably be accepted as consistent with the objective medical evidence and other evidence. [AR 18.]

The ALJ reviewed Curry's testimony, including her earlier history of a possible diagnosis of schizophrenia. [AR 17.] He found no evidence to support a conclusion that the possible diagnosis of schizophrenia from 2000 or earlier was a medically determinable impairment during the pertinent time frame. [AR 17.] Indeed, the evidence, as examined by the ALJ in reference to the RFC finding indicates Curry continued to work for the MTA subsequent to the questionable diagnosis. [AR 18.] The ALJ also noted that Curry testified she had "no problems doing the job as a bus cleaner," after the possible diagnosis of schizophrenia. [Id.]

The ALJ observed records and testimony indicating Curry attended college for two years but did not attain a degree, that she last worked in 2003, and quit that job, not because of a disability, but because her father passed away and she received an inheritance.  The ALJ considered Curry's testimony that she did photography work on the side. [Id.]

The ALJ reviewed the records pertaining to the 2006 stroke, along with Curry's testimony about the effects of that stroke. [Id.] For example, Curry testified she was right hand dominant, and that while she had problems initially with her left arm, she "kept going, and worked with her arm to get it going again." [Id.] Curry testified, as observed by the ALJ, that she "worked her [left] arm to the point she could use it, had some difficulty holding things, and that it took about six months to a year to be able to use her left arm."  The ALJ also relied on Curry's testimony that after the first stroke, "she had no problems walking, sitting, standing, talking, and no problems with her right arm or wrist."  She could use her left arm and hand to do photography.  Curry stated her left arm was initially weak after the first stroke, but eventually she "could do anything." [Id.] Indeed, as noted by the ALJ, Curry drove herself and her pets, between the dates of the two strokes, to Honduras.

24

The ALJ also considered evidence about Curry's decision not to obtain medical treatment after the first stroke.  While she claimed not to have insurance, other evidence indicated she had financial resources or was advised how to obtain free medical assistance. [AR 18, 20.] "The claimant not availing herself to treatment [after November 2006 through March 2008] suggests that the claimant may have misrepresented the degree of limitation present." [AR 20.]

The ALJ examined all medical evidence relating to the first stroke, including evidence that Curry's speech improved by her discharge date, she was ambulating well, and had loss of function of the left upper extremity. [AR 19.] The single progress note in 2007 noted that Curry reported no problems and only "a little bit of decreased grip strength on the left hand that seemed to have improved." [Id.]

The ALJ concluded that Curry was not entirely credible with respect to allegations concerning the pertinent time frame, to the extent the allegations were inconsistent with the RFC. The ALJ reasoned that Curry described activities that were not limited to the extent one would expect during that time frame, that she worked her left arm to the point she could use it in about six months after the 2006 stroke, that she had no problems walking, sitting, standing, talking, and no problems with her right side. [AR 20.] It was apparent to the ALJ, based on Curry's testimony, that between the dates of the two strokes, Curry was using two hands to do photography and was able to drive with her pets to Honduras on vacation in 2008. [Id.]

The ALJ concluded that the RFC assessment was supported by his weighing the record as a whole, that included the medical evidence, testimonial evidence, and documentary evidence. [Id.]

Curry argues that her testimony at the hearing indicates her left arm was very weak, she could not lift anything very heavy, and she had decreased grip strength on the left hand, although somewhat improved. [Doc. 18, at 12.] While Curry concedes that the ALJ discussed this testimony

along with her testimony that it took about six months to a year before she could use her left arm "just like if it was normal" except for heavy lifting [AR 43], she claims that the ALJ failed to discuss this difficulty in relating to the lifting requirements of medium work. [Doc. 18, at 12.] Curry asserts that the ALJ's failure to discuss Curry's specific limitations in lifting, carrying, and walking was reversible error. [Id., at 13.]

The Court disagrees and concludes that substantial evidence supports the ALJ's RFC assessment. There was evidence of record, on which the ALJ relied, to support the ALJ's physical RFC assessment. Essentially, Curry asks the Court to re-weigh the evidence and to find in her favor. This, the Court cannot do.

In addition, it is Curry's burden at step four of the sequential process to demonstrate she had limitations with respect to her ability to lift, carry, and walk during the pertinent time frame. There simply is no such evidence.

The Court concludes that the ALJ's RFC assessment is supported by substantial evidence and was not erroneous. The ALJ provided an adequate discussion of Curry's physical abilities and possible limitations. He ruled out the existence of a mental limitation during the pertinent time frame. The RFC findings are supported by substantial evidence.

### 2.      Mental Impairment

Curry also argues that the ALJ erred in not including mental limitations in the RFC. [Doc. 18, at 13-15.] She admits she was not under any psychological care between November 2006 and the DLI. However, she asserts that her "history of hallucinations and delusions in 1997-2000," a diagnosis of schizophrenia, and her treatment for mental issues in 2010 somehow support including mental impairments in the RFC.

Curry relies, in part, on a brain scan done at the time of her 2006 stroke showing "reduced brain tissue (gray and white matter) . . . ." [Id., at 14.] She then speculates that her "use of antipsychotic medications after her schizophrenic episode in the late 1990s" may have contributed to the first stroke in November 2006.  In support, Curry relies on a summary of a study regarding long-term antipsychotic treatment. [Id. n. 9.]

Curry summarily states more than once in briefing that "she is schizophrenic" [*see, e.g.,* Doc. 20, at 2], and yet the meager medical evidence from her remote history is unclear. Some of the 1990 medical records indicate "very infrequent episodes of auditory hallucinations" and need to "rule out" schizophrenia. [AR 733.] Several days later in 1998, the record indicates Curry was never free of auditory hallucinations but did not have a formal thought disorder and did not appear unusual.  The psychiatrist then still determined she could work. [AR 767-47.]

Curry's conclusory allegations of schizophrenia, under the circumstances of this case, do not establish or confirm the diagnosis. Not even expert Dr. Baum could do that.  He merely "suggested" that Curry was minimizing symptoms and that the diagnosis (that was questionable and needed to be ruled out in 1998) was permanent. [AR 757.] Moreover, Dr. Baum's "suggestions" were based on a review of remote medical records rather than his present evaluation of Curry, who was not taking psychiatric medications, exhibited no behavioral abnormalities during the exam, and reported no psychotic features. [AR 756.]

Curry's attorney also refers to "the literature" that she attaches to her brief, regarding "content-specific delusions from right caudate lacunar stroke." [Doc. 20-1.] The article states that patients with caudate lesions can present with content-specific delusions and is based on an 8-patient study.  Curry's reliance on medical literature in the briefing is speculative, at best, and far from

determinative on questions whether the ALJ committed error or did not support his findings with substantial evidence.

In other words, such speculation is not evidence to support a finding of mental impairments such that the purported impairments were sufficiently severe to be included in the RFC. The ALJ discussed those alleged impairments and thoroughly explained why the questionable and remote diagnosis of schizophrenia did not present a medically determinable impairment. [AR 17.]

Nor does the Court find persuasive Curry's argument that Dr. Baum's June 2011 psychological evaluation supports the inclusion of a mental impairment in the RFC. Again, the ALJ reviewed Dr. Baum's report and noted Dr. Baum's testing and examination of Curry. [AR 17.] "While Dr. Baum's assessment of the claimant's *current* mental condition may be accurate, it is not outcome determinative in this case." [Id.] (emphasis added). The ALJ explained this was true because Dr. Baum "offered no opinion" as to Curry's mental condition during the pertinent time frame.

The Court concludes that substantial evidence supports the ALJ's RFC assessment, including his decision not to include mental impairments in that assessment. The ALJ committed no error with respect to the RFC assessment.

### 3. Failure to Develop Record Regarding Mental Impairment

Curry argues that her history of schizophrenia, her current mental health treatment, and Dr. Baum's opinion triggered the ALJ's duty to develop the record. [Doc. 18, at 15-16.] Again, it is Curry who bears the burden of demonstrating she has a limiting impairment during the pertinent time frame, and that she is disabled. *See* Blea v. Barnhart, 466 F.3d 903, 908-09 (10th Cir. 2006) (claimant has burden to demonstrate disability from steps one through four; in Blea, this was problematic because the claimant only qualified for disability benefits if he could show that he was

disabled prior to his last insured date).  Moreover, this is not a case where the ALJ made negative inferences from an ambiguous record.  There simply is no medical evidence from the pertinent time frame, nor is the record ambiguous in view of Curry's own testimony.  Even if the ALJ had required additional mental health consultations or testing, such testing in 2011 or 2012 is highly unlikely to have shed light on Curry's condition from November 2006 to March 2008, where the unambiguous evidence is that she was able to engage in significant daily activities, including driving herself and her multiple pets on a long trip to Honduras through several countries.

In addition, Curry is reminded that her attorney at the hearing requested and received time to obtain a post-hearing neuro-psychological examination. [AR 77-79.]  Dr. Baum conducted this examination. [AR 756-59.]  Thus, she obtained the very evidence she now argues that the ALJ was required to order.  It is not clear why Curry argues additional evidence would have been different than Dr. Baum's report or how any medical expert could reach an opinion about a period where there was no medical evidence.

The Court disagrees with Curry's position that the onset date of her alleged disability was ambiguous.  In support of this view, Curry relies on remote records from the late 90s that do not conclusively diagnose her with schizophrenia, nor do the records indicate how long she was in treatment for that questionable diagnosis or how long she might have taken antipsychotic medication.  However, those early records do clearly indicate Curry was able to return to work and that she continued to work some years after she had an emotional breakdown.  She voluntarily stopped working after receiving an inheritance.  The ALJ relied on all of this evidence in reaching his RFC assessment and further considered the relevant regulations pertaining to whether there was a possible earlier onset date. [AR 19.] He found no support that Curry was disabled on an earlier onset date. [AR 20.]

The Court agrees that the ALJ is "responsible in every case 'to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.'" Typically, this means that the "ALJ has the duty to ... obtain [ ] pertinent, available medical records which come to his attention during the course of the hearing." Madrid v. Barnhart, 447 F.3d 788, 790 (10th Cir. 2006) (internal citations omitted).  Under the circumstances of this case, where the ALJ allowed time for an evaluation to be conducted and where there was no contemporaneous evidence of a mental impairment during the relevant period, the Court concludes that the ALJ did not err in requiring another evaluation or in attempting to develop further a nonexistent medical record.

Therefore, the Court concludes that substantial evidence supports the ALJ's decision and that he committed no error.

### 4.      Past Work Analysis

Curry argues that the ALJ erred by not developing the record regarding the demands of Curry's past work and whether she could meet those demands, in accordance with the requirements of Winfrey, 92 F.3d at 1024. [Doc. 18, at 20.] She claims that the ALJ's entire analysis of the issue was contained in one sentence and that such analysis was insufficient. [Id., at 21.]

Here, the ALJ relied on testimony from Curry about her past work [AR 64-65] and testimony by the VE concerning Curry's PRW [AR 72-78].  The VE testified about the work demands and requirements of a bus cleaner and cleaner of a building, including Curry's description of the positions as she performed the jobs.  The VE also testified about the job of an inventory clerk. [AR 73.] Curry's attorney asked questions of the VE but noted that counsel's questions pertained to the time frame after the DLI.  [AR 75.]

The ALJ concluded that Curry could perform these positions as the jobs did not require the performance of work-related activities precluded by her RFC.  In so finding, the ALJ relied in part

of the VE's testimony and noted that he compared the RFC to the physical and mental demands of the positions.  The ALJ determined that Curry could perform those jobs as they generally were performed. [AR 20.]

While the ALJ's findings as to the specific duties and demands of the PRW could have been more detailed, the Court concludes that the ALJ's findings are sufficiently specific to review and that they are not "woefully deficient" as argued by Curry. [Doc. 18, at 22.]  Again, it is Curry's burden to establish at step four that she is disabled and unable to perform her PRW.  She questions whether the ALJ considered the standing and walking requirements of those jobs, and yet, Curry testified that after the first stroke, she had no problems with those activities.  The Court concludes that Curry did not satisfy her burden in demonstrating she was unable to perform the demands of those jobs during the relevant time.

In sum, the Court finds that substantial evidence supports the ALJ's findings at step four and that he committed no error.

**VII.   RECOMMENDATION**

For the above-stated reasons, the Court recommends that Curry's motion to remand be denied and that this matter be dismissed with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

31